SMITH (CURTIS v.). See Case No. 3,505.
SMITH (CUSHING v.). See Case No. 3.511.
SMITH (DAVIDSON v.). See Case No. 3,608.

### Case No. 13,035.

SMITH et al. v. DELAWARE INS. CO.

[3 Wash. C. C. 127.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1811.[2]

MARINE INSURANCE—ILLICIT OR PROHIBITED TRADE —NEUTRALITY—ABANDONMENT—DELAY.

1. Action on a policy, on goods on board the Julius Henry, at and from Baltimore to Hamburgh, with leave to touch at Tonningen, warranted free from loss. charge, or damage, in consequence of seizure or detention for, or on account of: illicit or prohibited trade. What will be considered a delay of an abandonment. so as to affect the right to recover from the assurers.

2. Where a seizure is made within the territories of a foreign government, on account of illicit trade, it cannot be said the warranty is not broken, because the seizure was not made before the vessel arrived at her port of destination, or before she had an opportunity to do some act amounting to an actual trading.

3. In a case of a warranty of neutrality only, the parties have a view to the laws of nations, and subsisting treaties; and the insured only engages that the property is neutral, for the purpose of being protected; and in fulfilling this engagement, the insured can never be surprised by the want of all proper documents, except by his own neglect or fault.

4. A warrant against illicit or prohibited trade, has a view to the municipal laws and ordinances of the country. where the trade is to be carried on; and foreigners going there, are bound to know and to observe those laws.

5. The warranty amounts to a stipulation, that the trade in which the insured shall engage. shall be lawful to the purpose of protecting the property insured, and that it shall not become unlawful by the misconduct or neglect of the insured.

Action on a policy, dated 22d of August, 1807, on goods on board the Julius Henry, at and from Baltimore to Hamburgh, with leave to touch at Tonningen; valued at 10,-000 dollars; warranted free from any charge, damage, or loss, which may arise in conse-

quence of seizure or detention for, or on account of, illicit or prohibited trade.

The facts of the case are substantially as follows: This vessel, belonging to the plaintiffs [Smith & Buchanan], sailed with a cargo, also the property of the plaintiffs, from Baltimore, about the 22d of August, 1807, with a letter of instructions to the master, to go to Tonningen, or to Hamburgh, if the Elbe should not be blockaded; and upon his arrival at Tonningen, to write to Van Hollen, the agent of the plaintiffs, and consignee of the cargo, at Hamburgh, (whose orders the captain was to follow,) informing him of his arrival. The bill of lading, invoice, and outward manifest. all speak of Tonningen as the port of destination. The vessel having proceeded as far as Heligoland, was there warned by a British vessel of war not to go to Tonningen, as the Eider was blockaded; in consequence of which, he sailed for Hamburgh. and arrived at Cuxhaven about the 22d of October, where the vessel was seized, the papers examined by the custom-house officers at that place; and a French officer and other persons were put on board, who proceeded with her to Hamburgh. where her cargo was landed, under the orders of the principal officer of the customs at that place: and a part of it was then sent off to France, in wagons, and the residue was sold at Hamburgh. Hamburgh, as well as Cuxhaven, was then in the possession of the French government, and all the transactions in relation to this vessel and her cargo, were conducted by persons representing the emperor. The cause alleged for the seizure, and also for the condemnation of the vessel and cargo, (which soon followed, and which was afterwards confirmed by the emperor,) was the not having on board a certificate of the origin of the cargo, as required by the French decree of the 6th of August, 1807. The third article of this decree declares, "that colonial goods shall not be admitted, but when accompanied with certificates of origin, by our commissary of commercial relations residing at the ports of embarkation, although they did not proceed from England or her colonies." It appears, by the correspondence between Van Hollen and the plaintiffs, that notice was given by the former to the latter. so early as the 11th of September, 1807, of the seizure, and the cause of it; and by other letters dated early in November, it was stated, by the agent, that he should put in a claim at Paris. In December, the agent's letters informed the plaintiffs, that the American minister at Paris could no nothing for the relief of the property, and he expresses himself very despairingly as to the release of it. But by a letter dated the 15th of January, 1808, the agent expresses some hope of success, from a petition which he had presented, in which case, he adds, that the adventure may turn out very advantageous to the plaintiffs. in consequence of the high price of the articles composing this cargo.

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington. Associate Justice of the Supreme Court of the United States. under the supervision of Richard Peters, Jr.. Esq.]

[2] [Reversed in 7 Cranch (11 U. S.) 434.]

These letters, and many others, were received by the plaintiffs, from the 21st of December, 1807, to the 2d of May, 1808; and on the 9th of June following, the offer to abandon was made, and after some time refused. The plaintiffs, in one of their letters to Van Hollen, dated the 17th of April, 1807, expressed their hope that the cargo would be released, and that the seizure might ultimately turn out to their advantage.

Upon this evidence, the court left it to the jury to say, whether the abandonment was made in due time; expressing, at the same time, a strong opinion that it was not, and that it was delayed, with a view to take the chance of an acquittal, and to speculate upon the high market for these goods. The jury were directed, in case they should be of opinion that the abandonment was not made in time, to find for the defendants, subject to the opinion of the court upon the points of law arising in the cause; the defendants agreeing, that judgment should be entered for the plaintiffs, for the sum ascertained by the parties, in case the law should be decided against them. The jury having found for the defendants, under the charge of the court, and consequently, that the abandonment was not made in due time; the questions of law arising in the cause, and reserved for the opinion of the court, are—1. Whether the plaintiffs are entitled to recover any thing in this action, the loss having become total?—and secondly, Whether the warranty against loss, on account of seizure or detention for illicit or prohibited trade, has been complied with?

WASHINGTON, Circuit Justice. The opinion of the court will be confined to the second question. It is contended by the counsel for the plaintiffs, that this warranty extends only to illicit trading, by sale, barter, or otherwise, which did not take place in this case, inasmuch as the vessel entered the Elbe, not with a view to trade, but from necessity, in consequence of the blockade, which prevented her from going to Tonningen; and that she was seized before she had broke bulk, or done any act which amounted to a trading. That in fact, the trade she contemplated was not illicit or prohibited, because the cargo had not come from a British colony, and consequently, did not come within any of the French decrees, in force at the time of the seizure. That the decree of the 6th of August, merely required a certain document to accompany the cargo, which it was impossible the plaintiffs could have complied with, the decree not having been known, nor could it have been known in the United States, at the time the vessel sailed; and finally, that the law can never be so unjust, as to punish any person for omitting to perform an impossibility.

First, it is said, that this vessel went to Cuxhaven from necessity, and that she did not trade previous to the seizure. If the first branch of this argument were true, it would be at once destructive to the plaintiffs' right of recovery. For, if the destination of this vessel was to Tonningen, and not to Hamburgh, there never was an inception of the voyage insured, which was to Hamburgh, with leave to touch at Tonningen; and consequently, the policy never attached. It is true, that the bill of lading, and outward manifest, are for Tonningen, and even the letter of instructions, seemed to warrant the ending of the voyage at that place. But, as no objection on this ground was made at the trial by the counsel for the defendants, it is fair to suppose, that the defendants were satisfied that the termini of the voyage were, in reality, such as are mentioned in the policy. If so, it will be difficult to maintain the ground taken by the plaintiffs' counsel, that where a seizure is made within the territories of a foreign government, on account of illicit trade, the warranty is not broken, because it was made before the vessel had arrived at the port of her destination, or had an opportunity to do some act amounting to an actual trading. Where the policy is on the outward cargo, as in this case, it can seldom, if ever, fairly happen, that the seizure should not precede such a trading; since the illegality of the contemplated trade must be discovered, before the unlading or breaking bulk would be permitted. It is true, that in such a case, if it appear that there has been no mala fides, but that the neutral has acted under an entire ignorance of the municipal law of the country, where he intended to trade, humanity would seem to forbid a just nation, from proceeding further than to turn him away; yet, if a more rigid conduct is adopted, or if an intended breach of the law be proved or suspected, and the property is seized and condemned, justly or unjustly, but avowedly for a breach of such law, it is impossible for a reasonable doubt to exist, that the loss has not happened on account of a prohibited trade. A different construction would render this warranty, so hazardous to the insured, of very little consequence to him, and a mere nullity in respect to the insurers.

Secondly. It is said, that this trade was not prohibited, and that the condemnation proceeded upon the ground of the want of a document to prove the origin of the cargo. In order to test the strength of this argument, let it be supposed, that the decree of the 6th of August had been known in the United States, before this vessel sailed. Would it, in that case, be contended, that the want of the document required by this decree, would not have amounted to a breach of the warranty? And if it would, it proves, that without the document, the trade was illicit and prohibited. But we understand the decree to amount to this—that articles, the produce of the colonies of Great Britain, are prohibited from being brought, upon any

terms, into any place possessed by the French; and the produce of any other country is prohibited, which is not accompanied by a certificate of origin, no matter how conclusive the proof may be, that it was not the growth of a British colony. In either case, the trade is prohibited altogether, whether the decree, containing the prohibition, were known to the neutral or not. If, then, the knowledge or ignorance of the neutral, in respect to the decree, makes no difference in regard to the illegality of the trade, the whole question comes to the hardship and injustice to which the merchant is made the victim, as to which, there can be but one opinion. But who is to be the sufferer in such a case? The insured, who consented to exempt the insurer from all loss which might happen on account of illicit trade; or the insurer, who, in estimating the premium for the risk he undertakes, has allowed to the insured, what both parties supposed to be the value of this exemption? Most undoubtedly the former. In the case of a warranty of neutrality, the parties have a view to the law of nations and subsisting treaties; and the engagement of the insured is, that the property is neutral to the purpose of being protected. It must of course be neutral, in fact, in appearance, and in conduct. In fulfilling this engagement, the insured can never be surprised by the want of all necessary documents, unless by his own neglect. But, the warranty in this policy has a view to the municipal laws and ordinances of the country, with which the trade is intended to be carried on, which the subjects or citizens of foreign countries are bound to observe, whether previously made known to them or not. Ignorance of such laws, will be no excuse for a breach of them; and an engagement with a third person not to violate such laws, cannot be satisfied by a plea, which would be ineffectual in the country where the law was broken, and the penalty incurred. The warranty against illicit trade, amounts, in short, to a stipulation that the trade in which the insured engages, shall be lawful to the purpose of being protected:—that is, that it shall not only be lawful in fact, but that it shall not become otherwise by the misconduct of the insured, or from the want of all necessary documents required by the laws of the country to legitimate it. For, what would it signify to the insurer, whether the loss arose from the circumstance that the trade was prohibited altogether, or was prohibited unless accompanied by certain documents?

That the seizure and condemnation of property, because it was unaccompanied by papers which the insured could not possibly know were required, is to the highest degree unjust, has already been admitted. But is this more unjust, or does it impose a greater hardship on the insured, than if a trade known to be lawful when the voyage was commenced, should be prohibited but the day before the arrival of the vessel, and on this recent order or law, she should be seized and condemned? And yet it can scarcely be doubted by any one, but that in such a case, the warranty would protect the insurer. The truth is, that the insured, by such a warranty, takes upon himself every risk which can occur in consequence of the trade being prohibited, whether absolutely, or under any qualification, and whether known or unknown to him; and for an engagement attended with so much danger, especially during the present European war, he is entitled, and no doubt takes care, to indemnify himself, by a proper diminution of the premium.

[The judgment of this court was reversed by the supreme court, where it was carried on writ of error. 7 Cranch (11 U. S.) 434.]